# EXHIBIT A

# OPERATING AGREEMENT

# OF

# CONEY ISLAND PICNIC, LLC

This **OPERATING AGREEMENT** (this "*Agreement*") of **CONEY ISLAND PICNIC, LLC**, a Nevada limited liability company (the "*Company*"), is entered into effective as of June 1, 2021 (the "*Effective Date*"), among the Company, the Managers (as defined below), and the other members of the Company whose names are set forth on **Schedule 1** hereto as it may be amended from time to time in accordance with this Agreement (such members and their respective permitted successors-in-interest being hereinafter referred to individually as a "*Member*", or collectively, as the "*Members*"). Unless otherwise specified in this Agreement, capitalized terms used herein shall have the meanings set forth in **Appendix A** to this Agreement.

## RECITALS:

**WHEREAS**, the Company was initially formed as "Coney Island Picnic, LLC" under the laws of the State of Nevada when the Company's Articles of Organization (the "*Articles*") were filed with the Nevada Secretary of State on April 23, 2021; and

**WHEREAS**, the parties to this Agreement desire to enter into this Agreement, which shall be become effective as of the Effective Date in order to set forth the Members' respective rights, powers, obligations and duties relating to the Company, as well as the operation and governance of the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I - ORGANIZATION AND POWERS

1.01 Company Name. The name of the Company is "**Coney Island Picnic, LLC**". The business and operations of the Company may be conducted under that name or any other name or names that the Managers may from time to time select.

1.02 Purposes and Powers. The purposes of the Company, generally, shall be to engage in any lawful business, purpose or activity for which a limited liability company may be formed under the Chapter 86 of the Nevada Revised Statutes, as amended from time to time (the "*Act")*, as determined by the Managers from time to time. The Company shall possess and may exercise all of the powers and privileges granted by the Act or which may be exercised by any Person, together with any powers incidental thereto, so far as such powers or privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

1.03 Principal Place of Business. The principal office and place of business of the Company shall initially be located at such place as the Managers may designate from time to time, and the Company shall maintain records there for inspection pursuant to the Act. The Company may have such other offices as the Managers may designate from time to time.

1.04 Fiscal Year. The fiscal year of the Company shall end on December 31 in each year or such other date as the Managers, in their sole and absolute discretion, may determine from time to time.

1.05 Qualification in Other Jurisdictions. To the extent required by Applicable Law, the Managers shall cause the Company to be qualified or registered under the Applicable Laws of any other jurisdiction in which the Company transacts business and shall be authorized to execute, deliver and file any certificates and documents necessary to effect such qualification or registration, including without limitation, the appointment of agents for service of process in such jurisdictions.

1.06 Term. The term of the Company commenced on April 23, 2021, and shall continue in perpetuity until the Company is dissolved in accordance with the provisions of this Agreement.

1.07 Registered Agent and Office. The registered office of the Company required by the Act to be maintained in the State of Nevada shall be the office of the registered agent named in the Articles or such other office (which need not be a place of business of the Company) as the Managers, in their sole and absolute discretion, may designate from time to time in the manner provided by Applicable Law. The registered agent of the Company in the State of Nevada shall be the registered agent named in the Articles or such other Person as the Managers, in their sole and absolute discretion, may designate from time to time in the manner provided by Applicable Law.

1.08 No Partnership Intended for Nontax Purposes. The Members have formed the Company under the Act, and expressly deny any intent hereby to form a partnership under Applicable Law. Except for purposes of federal, state and local taxes, the Members do not intend to be partners to one another, or partners to any third party.

1.09 Construction. The term "*Member*" as used herein shall correspond to the term "member" within the meaning of the Act and the term "*Manager*" as used herein shall correspond to the term "manager" within the meaning of the Act. This Agreement shall constitute the "Operating Agreement" of the Company within the meaning of the Act for all purposes including, without limitation, for classification of the Company as a partnership for federal and all relevant state and local income tax purposes. The rights, powers, duties, obligations and liabilities of the Members and Managers shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member or the Managers are different by reason of any provision of this Agreement than they would be under the Act in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control. Any reference to an Exhibit or Schedule or Appendix in this Agreement (including **Schedule 1** – Members and Units and **Appendix A** – Defined Terms) shall be deemed to be a reference to such Exhibit or Schedule or Appendix as amended and in effect from time to time. The Exhibits, Schedules and Appendices to this Agreement shall be deemed a part of this Agreement.

1.10 Ratification of Past Actions. By executing this Agreement, each party signatory hereto, in their capacities as a Member or a Manager, hereby ratifies all actions previously taken by or on behalf of the Company, including, without limitation, the formation of the Company, establishment of any bank account, the hiring of professional advisors, the grant of incentive or management compensation, the issue of Units, the undertaking of investments, the entry into contracts and all other actions as may have been material to the Company's continued development and operations since formation.

## ARTICLE II - UNITS AND MEMBERS

2.01 Units.

(a) Ownership Interest Generally. All Membership Interests in the Company shall be as set forth in this Agreement and shall be represented by Units authorized and issued by the Company in accordance with this Agreement, which may be divided into one or more types, classes or series in accordance with the terms of this Agreement. Each type, class or series of Units shall have the privileges,

preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. The Managers shall maintain a schedule of all Members, their respective mailing addresses and the amount and class and series of Units held by them (the "*Members Schedule*"), and the Managers shall update the Members Schedule upon the issuance or Permitted Transfer of any Units to any new or existing Member (provided that such issuance or Permitted Transfer has been made in accordance with the terms and conditions of this Agreement). A copy of the Members Schedule as of the execution of this Agreement is attached hereto as **Schedule 1**.

(b) Authorization. Subject to the terms of this Agreement, as of the Effective Date, the Company is authorized to issue, offer and sell, or cause to be offered and sold Class A Common Units.

(c) Certificates. Unless the Managers determine otherwise, the Units shall not be certificated. In the event that the Units are certificated, such certificates shall, in addition to any other legend required by Applicable Law, bear a legend substantially in the following form:

> THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO AN AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, GIFT, PLEDGE, ENCUMBRANCE, HYPOTHECATION, OR OTHER DISPOSITION OF THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH OPERATING AGREEMENT.
>
> THE MEMBERSHIP INTERESTS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, GIFTED, PLEDGED, ENCUMBERED, HYPOTHECATED, OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

(d) Preemptive Rights. If the Managers authorize the issuance or sale by the Company of any additional Units or any equity securities for or convertible into Units (the "*New Units*") to Persons, other than Members or employees pursuant to an equity incentive plan approved by the Managers, the Managers shall first offer to sell to each Member, on the same terms and conditions as the proposed issuance of New Units, such Member's *pro rata* portion (in accordance with their relative Percentage Interest in effect at such time) of the New Units. To exercise such preemptive right, each Member shall give the Managers notice that conforms to the requirements for notice under this Agreement of its intention to exercise such right within five (5) Business Days from receipt of notice from the Company, which notice from the Company shall describe in reasonable detail the number and type of New Units to be offered, the material terms and conditions of the proposed New Units, the purchase price of the New Units, the intended offerees, the period of time in which the preemptive right hereunder must be exercised and each Member's *pro rata* portion of the New Units. To the extent the consideration for the New Units does not consist of cash or cash equivalents, each Member exercising its preemptive right shall pay cash therefor in an amount equal to the **fair market value** of such non-cash consideration. If any Member fails to exercise its right to purchase its entire *pro rata* portion of the New Units, the New Units not subscribed for by such Member shall be offered to the Members who have exercised their preemptive rights in full, on a *pro rata* basis (in accordance with such Members' relative Percentage Interests). To the extent that any New Units have not been sold to eligible Members pursuant to this Section, the Managers may, for a period of ninety (90) calendar days thereafter, sell any unsold New Units, to the extent any exist, at the same price and upon the same general terms offered to the Members, which shall be no more favorable to the purchasers than specified in the notice given to each Member. Upon the issuance of New Units pursuant

to this Section, the Member Schedule shall be amended to reflect such New Units and the adjustment to the Members' Percentage Interests in connection therewith.

2.02 Members.

(a) Additional Members; Classes of Units.

(i) Subject to Applicable Law, the Managers may establish eligibility requirements for admission of a Person as a Member and refuse to admit any Person that fails to satisfy such eligibility requirements. Subject to the preceding sentence, the Managers shall have the sole responsibility for determining whether a Person is eligible to be a Member. New Members shall be admitted at the time when all conditions to their admission have been satisfied, as determined by the Managers, in their sole and absolute discretion, and their identity and Units (including their Initial Capital Contribution, as provided in **Section 6.02**) have been established by amendment of the Members Schedule in accordance with this Agreement and such new Members have executed a written undertaking substantially in the form of the Joinder Agreement, if such Person is a natural person who has a Spouse, an executed written undertaking substantially in the form of the Spousal Consent and delivered such other documents or instruments as may be required by the Managers to reflect the provisions hereof.

(ii) The Managers may (A) provide for the creation of new classes of units which may have terms and preferences different from the then-existing Units, provided that an amendment of this Agreement that sets forth the terms and preferences of such new class of units is approved as an amendment of this Agreement pursuant to **Section 10.04**; (B) admit as additional Member(s) to the Company Persons to whom units of any such newly created class are being issued; and (C) cause the Company to issue additional units, or options and/or warrants to purchase units, of any class to any such additional Member(s) or any current Member.

(b) Voting; Meetings of the Members; Action by Written Consent.

(i) Voting. There shall be no required meetings of the Members and no actions with respect to the Company shall require a vote or approval by the Members except as required by a non-waivable provision of Applicable Law or as expressly required by this Agreement. For situations, if any, in which the consent or approval of the Members (or any subset of the Members) is expressly required by this Agreement or by a non-waivable provision of Applicable Law, the Members may act through written consents, executed by the Members whose consent or approval is so required, provided that prompt written notice of such action is delivered to each other Member. Except to the extent this Agreement expressly provides otherwise, all required actions, consents and approvals by the Members hereof shall be effective if taken by Members holding a majority of the Units then outstanding and entitled to vote on the matter.

(ii) Meetings of the Members. If any meeting of the Members entitled to vote at such meeting shall be called, such meeting may be held at the principal executive office of the Company or at such other location as may be designated by the Managers. Following the call of any such meeting, the Managers shall give written notice of such meeting to all Members entitled to vote at such meeting at least forty-eight (48) hours prior to the time set for such meeting. For the sake of clarity, Class A Common Members shall be entitled to one vote per Unit on all matters on which such class of Members are entitled to vote. The notice shall state the place, date, and hour of the meeting and the general nature of business to be transacted. No other business may be transacted at the meeting. The presence at a meeting of a majority of the Members entitled to vote on the matter or matters to be considered at such meeting in person or by proxy, constitutes a quorum for the transaction of business.

(iii) Action by Written Consent. Any action required or permitted to be taken by a vote of the Members may be taken without a meeting, if a consent or consents in writing, setting forth the action so taken, shall be signed by Members holding such number and class Units having not less than the number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voted. Every written consent shall bear the effective date of signature of each Member who signs the consent, and no written consent shall be effective to take the action referred to therein unless, within sixty (60) days of the earliest dated consent, written consents signed by a sufficient number of Members entitled to take action are executed. Prompt notice of the taking of the corporate action without a meeting by less than unanimous consent shall be given to all Members who have not consented in writing.

(c) Authority of Members. Except as otherwise expressly provided herein, no Member, in its capacity as a Member, shall have any authority to act for, or to assume any obligations or responsibility on behalf of, or make decisions for or on behalf of, or bind the Company.

(d) Profits Interests; Appreciation Rights. The Company may, from time to time, issue (i) units intended to be intended to be treated for United States federal income tax purposes as "profits interests" within the meaning of Revenue Procedure 93-27 and Revenue Procedure 2001-43 or (ii) phantom or other similar "synthetic" equity units to officers, employees, advisors or consultants, in each case, pursuant to one or more plans adopted by the Managers.

(e) Disassociation. No Member shall have the ability to dissociate or withdraw as a Member pursuant to the Act, or otherwise, before the dissolution and winding up of the Company without the prior written approval of the Managers (which approval shall not be unreasonably withheld, conditioned or delayed), and any such dissociation or withdrawal or attempted dissociation or withdrawal by a Member before the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Membership Interests, such Person shall no longer be a Member; provided, however, that this Agreement shall continue to apply with respect to any Units that have been called in accordance with **Section 3.08** until full payment is made therefor in accordance with the terms of this Agreement.

(f) Expulsion Generally. Subject to Applicable Law, a Member may be expelled from the Company for General Cause, upon a majority vote of the Class A Common Members to expel such Member pursuant to this **Section 2.02(f)**. Following a vote for expulsion, upon notice from the Company to the expelled Member of such expulsion, the Member in question shall be expelled. For purposes of this Section only, "*General Cause*" means: (i) a Member materially breaches this Agreement (including without limitation a breach of **Section 2.03**, below) and fails to cure (if subject to cure) the breach within a reasonable time after the Company delivers notice of the breach; (ii) a Member engages in a Bad Act; and (iii) a Member withdraws, resigns, and/or retires as a Member without consent in violation of **Section 2.02(e)**.

(g) Death. The death of any Member shall not cause the dissolution of the Company. In such event the Company and its business shall be continued by the remaining Member or Members and, subject to **Section 3.08**, the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; provided, that within a reasonable time after such Transfer, the applicable heirs shall sign a written undertaking substantially in the form of the Joinder Agreement; provided, further, that, regardless of whether such heirs sign a written undertaking substantially in the form of the Joinder Agreement, such heirs shall, in any event, be bound by the terms and conditions of this Agreement as a Member.

(h) No Interest in Company Property. No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

2.03 Member Representations, Warranties and Covenants.

(a) By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, severally and not jointly, whether admitted prior to the date hereof, as of the Effective Date, or after the date hereof, represents and warrants to the Company and to each Member and acknowledges that:

(i) The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with;

(ii) Such Member is, and at the time of investment was, an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that could have an adverse effect on the availability of any available exemption from registration under the Securities Act with respect to the offer and sale of the Units;

(iii) Such Member's Units have been and/or are being acquired for its own account solely for investment and not with a view to resale or distribution thereof;

(iv) Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition, and prospects of the Company and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises, and records of the Company for such purpose;

(v) The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition, and prospects of the Company that may have been made or given by any other Member or by any agent or employee of any other Member;

(vi) Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(vii) Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(viii) The execution, delivery, and performance of this Agreement (whether by counterpart or by joinder) have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other

governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound; and

(ix) This Agreement is valid, binding, and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

None of the foregoing shall replace, diminish, or otherwise adversely affect any Member's representations and warranties made by it in any subscription or similar agreement or other agreement by which such Member acquired Units.

(b) Each Member covenants and agrees with each of the other Members and the Company that such Member at all times shall:

(i) not subject the assets of the Company, to the claims of such Member's, or such Member's equity holder's, individual creditors or intentionally subject such Member's Units or its respective interests and rights, including its right in the future to receive distributions from the Company;

(ii) defend at such Member's sole cost and expense any claim made against such Member's Units or its respective interests and rights, including such Member's right in the future to receive distributions from the Company, or the assets of the Company, resulting from the personal indebtedness of such Member or such Member's equity holders, including any holders of securities convertible, exchangeable, or which may be exercised for equity of such Member;

(iii) give full and complete information to the Managers as to any letters, accounts, legal process or papers, writings or other things which shall come into such Member's knowledge or possession concerning the business of the Company and any actual or reasonably likely potential conflicts of interests affecting such Member vis-à-vis the Company; and

(iv) promptly notify the Managers as to any claims asserted or threatened against such Member's Units or its respective interests and rights, including such Member's right in the future to receive distributions from the Company.

2.04 Limited Liability of Members. Except as otherwise specifically provided in the Act, by Applicable Law or under this Agreement, no Member of the Company (including the Managers) shall be obligated personally for any debt, obligation or liability of the Company or of any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member of the Company. The failure of the Company to observe any formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Agreement or the Act shall not be grounds for making its Members or the Managers or the Company Representative responsible for the liabilities of the Company.

2.05 Intentionally Left Blank.

## ARTICLE III - TRANSFERS OF UNITS

3.01 General Restrictions on Transfers. No Member may Transfer all or any of its Units except (a) as provided in **Section 3.05**, or (b) with the consent of the Managers, which may be withheld or denied for any reason or for no reason subject to the terms of this Agreement (each, a "*Permitted Transfer*").

3.02 Requirements for Transfer. Every Transfer of Units permitted hereunder, other than Transfers pursuant to **Section 3.07**, shall be subject to the following requirements:

(a) The proposed Transfer will not cause or result in a breach or termination of any agreement binding upon the Company or any violation of this Agreement or Applicable Law, including without limitation, federal or state securities laws, and that the proposed Transfer would not cause the Company to be an investment company as defined in the Investment Company Act of 1940, as amended, and the rules and regulations promulgated thereunder by the SEC or a reporting company pursuant to Section 12 or Section 15 of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder by the SEC;

(b) The Transfer shall not result in the Company's becoming subject to tax as a corporation pursuant to Section 7704 of the Code;

(c) The Transferee shall not be engaged in a business competitive with the Company at the time of transfer as determined by the Managers, in their sole and absolute discretion;

(d) The Transferor shall have complied with all of the provisions of this Agreement, including, without limitation, this **Article III**; and

(e) The Transferee shall execute a Joinder Agreement and shall deliver such other documents or instruments as may be required by the Managers to reflect the provisions hereof, including, as applicable, any written opinions of counsel.

The Members Schedule shall be updated in accordance with **Section 2.01(a)** to reflect any Transfer made pursuant to and in accordance with this **Article III**. Until the foregoing requirements are met, the Company shall not recognize the Transfer or the Transferee for any purpose under this Agreement, and the Transferee shall be entitled only to the rights of a Transferee who is not a Member under the Act.

3.03 Effect of Transfer.

(a) If the Transferee of Units is admitted as a Member in accordance with this Agreement or is already a Member, the Member Transferring its Units shall be relieved of liability with respect to the Transferred Units arising or accruing under this Agreement on or after the effective date of the Transfer, unless the Transferor affirmatively assumes such liability; provided, however, that the Transferor shall not be relieved of any liability for prior distributions and unpaid Capital Contributions.

(b) Any Person who acquires in any manner a Unit or any part thereof in the Company, whether or not such Person has accepted and assumed in writing the terms and provisions of this Agreement or been admitted as a Member, shall be deemed by the acquisition of such Units to have agreed to be subject to and bound by all of the provisions of this Agreement with respect to such Units, including without limitation, the provisions hereof with respect to any subsequent Transfer of such Units.

3.04 Prohibited Transfers. Any Transfer in violation of any provisions of this Agreement shall be null and void and ineffective to Transfer any Unit in the Company and shall not be binding upon or be

recognized by the Company, and any such Transferee shall not be treated as or deemed to be a Member for any purpose (including without limitation under **Article VII**). In the event that any Member shall at any time Transfer its Units in violation of any of the provisions of this Agreement, the Company and the other Members, in addition to all rights and remedies at law and equity, shall be entitled to obtain an order restraining or enjoining such transaction, it being expressly acknowledged and agreed that damages at law would be an inadequate remedy for a Transfer in violation of this Agreement. In addition, such Member that Transfers its Units in violation of any of the provisions of this Agreement shall indemnify and hold harmless the Company for reasonable attorneys' fees and other costs incurred by the Company in enforcing this **Section 3.04** against such Member.

3.05 Certain Permitted Transfers.

(a) The following Transfers of Units shall be permitted without compliance with this **Article III** other than the applicable requirements of **Sections 3.02(a), (b), (c)** and (**e**).

(i) Units may be Transferred by a Member from time to time in connection with a tax-free reorganization, merger or consolidation of the Company approved by the Managers;

(ii) Units may be Transferred to a Permitted Transferee; and

(iii) Units may be Transferred by a Member in accordance with **Section 3.06** or **3.08**.

(b) Transfers of Units shall be permitted pursuant to **Section 3.07** without compliance with this **Article III** except as provided in **Section 3.07**.

3.06 Tag-Along Obligations.

(a) No Member or Members (referred to in this **Section 3.06** as the "*Selling Member(s)*") may Transfer a number of Units to any proposed Transferee (a "*Proposed Tag-Along Transfer*") such that the proposed Transferee would acquire a majority of the outstanding voting Units unless the proposed Transferee also offers to purchase at the same time the Units held by all other Members (each a "*Tag-Along Member*") at the same price per Unit and pursuant to the terms of this **Section 3.06**; provided, however, that the provisions of this **Section 3.06** shall not apply to any Transfer of Units made in accordance with **Section 3.05**.

(b) Prior to the consummation of a Proposed Tag-Along Transfer, each Selling Member shall deliver to the Company and each other Member a written notice (a "*Sale Notice*") of the proposed sale subject to this **Section 3.06** no more than ten (10) days after the execution and delivery by all the parties thereto of the definitive agreement entered into with respect to the Proposed Tag-Along Transfer and, in any event, no later than twenty (20) days prior to the closing date of the Proposed Tag-Along Transfer. The Sale Notice shall make reference to the Tag-Along Members' rights hereunder and shall describe in reasonable detail:

(i) the number of Units to be sold by each Selling Member and the percentage which this bears to the total number of Units held by such Selling Member;

(ii) the name of the proposed Transferee and, if applicable, its ultimate control Person(s);

(iii) the per Unit purchase price and the other material terms and conditions of the sale, including a description of any non-cash consideration in sufficient detail to permit the valuation thereof;

(iv) the proposed timing of the closing of the sale; and

(v) a copy of any form of agreement proposed to be executed in connection therewith.

(c) Each Tag-Along Member shall only be entitled to exercise its right to participate in a sale of Units by the Selling Member subject to this **Section 3.06** by delivering to the Selling Members a written notice (a "*Tag-Along Notice*") stating its election to do so and specifying the number of Units to be sold by it no later than ten (10) days after receipt of the Sale Notice (the "*Tag-Along Period*"). The offer of each Tag-Along Member set forth in a Tag-Along Notice shall be irrevocable, and such Tag-Along Member (each, an "*Electing Tag-Along Member*") shall be bound and obligated to sell in the proposed sale on the terms and conditions set forth in this **Section 3.06.** Each Tag-Along Member shall have the right to sell in a sale subject to this **Section 3.06** the number of Units equal to the product obtained by multiplying (x) the number of Units held by the Tag-Along Member by (y) a fraction (A) the numerator of which is equal to the number of Units the Selling Members propose to sell or transfer to the proposed Transferee and (B) denominator of which is equal to the number of Units then owned by such Selling Members.

(d) In the event the proposed Transferee elects to purchase less than all of the Units sought to be sold by the Electing Tag-Along Members, the number of Units to be sold to the proposed Transferee by the Selling Member and each Electing Tag-Along Member shall be reduced so that each such Member is entitled to sell its *pro rata* portion of the number of Units the proposed Transferee elects to purchase (which in no event may be less than the number of Units set forth in the Sale Notice).

(e) Each Tag-Along Member who does not deliver a Tag-Along Notice in compliance with clause (c) above shall be deemed to have waived all of such Tag-Along Member's rights to participate in such sale, and the Selling Members shall (subject to the rights of any Electing Tag-Along Member) thereafter be free to sell to the proposed Transferee its Units at a per Unit price that is no greater than the per Unit price set forth in the Sale Notice and on other same terms and conditions which are not materially more favorable to the Selling Members than those set forth in the Sale Notice, without any further obligation to the non-accepting Tag-Along Members.

(f) Subject to the last sentence set forth in **Section 3.06(a)**, each Member participating in a sale pursuant to this **Section 3.06** shall receive the same consideration per Unit after deduction of such Member's proportionate share of the related expenses in accordance with paragraph (h), below.

(g) Each Electing Tag-Along Member shall make or provide the same representations, warranties, covenants, indemnities and agreements as each Selling Member makes or provides in connection with the Tag-Along Sale (except that in the case of representations, warranties, covenants, indemnities and agreements pertaining specifically to such Selling Member, in which case, the Tag-Along Member shall make the comparable representations, warranties, covenants, indemnities and agreements pertaining specifically to itself); provided, that all representations, warranties, covenants and indemnities made by each Selling Member and each Electing Tag-Along Member with respect to itself shall be made severally and not jointly and any indemnification obligation in respect of breaches of representations and warranties that do not relate to an Electing Tag-Along Member shall be in an amount not to exceed the aggregate proceeds received by an Electing Tag-Along Member in connection with any sale consummated pursuant to this **Section 3.06**.

(h) The fees and expenses of the Selling Members incurred in connection with a sale under this **Section 3.06** and for the benefit of all Members participating in a sale pursuant to this **Section 3.06** (it being understood that costs incurred by or on behalf of any Selling Member for its sole benefit will not be considered to be for the benefit of all Members), to the extent not paid or reimbursed by the Company or the proposed Transferee, shall be shared by all the Members participating in a sale pursuant to this **Section 3.06** on a *pro rata* basis, based on the consideration received by each such Member; provided, that no Member shall be obligated to make any out-of-pocket expenditure prior to the consummation of the transaction consummated pursuant to this **Section 3.06**.

(i) Each Electing Tag-Along Member shall take all actions as may be necessary to consummate the Tag-Along Sale, including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Selling Members.

(j) The Selling Members shall have ninety (90) days following the expiration of the Tag-Along Period in which to sell the Units described in the Sale Notice, on terms not more favorable to the Selling Members than those set forth in the Sale Notice (which such ninety (90) day period may be extended for a reasonable time not to exceed one hundred twenty (120) days to the extent reasonably necessary to obtain any regulatory approvals). If at the end of such period the Selling Members have not completed such sale, the Selling Members may not then effect a sale of Units subject to this **Section 3.06** without again fully complying with the provisions of this **Section 3.06**.

(k) If the Selling Members sell or otherwise transfer to the proposed Transferee any Units in breach of this **Section 3.06**, then each Tag-Along Member shall have the right to sell to the Selling Members, and the Selling Members undertake to purchase from each Tag-Along Member, the number of Units that such Tag-Along Member would have had the right to sell to the proposed Transferee pursuant to this **Section 3.06**, for a per Unit amount and form of consideration and upon the term and conditions on which the proposed Transferee bought such Units from the Selling Members, but without indemnity being granted by any Tag-Along Member to the Selling Members; provided, that nothing contained in this **Section 3.06** shall preclude any Member from seeking alternative remedies against such Selling Members as a result of its breach of this **Section 3.06**. The Selling Members shall also reimburse each Tag-Along Member for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Tag-Along Member's rights under this **Section 3.06(k)**.

3.07 Drag-Along Rights. In the event of a proposed Sale Transaction, the Class A Common Member may require that each other Member Transfer his or her Units in the Sale Transaction. Each Member will receive in the Sale Transaction in respect of his or her Units a *pro rata* portion of the entire consideration to be received by all the Members in or following the Sale Transaction, each class of Units being deemed, for this purpose, to have the same value. The Class A Common Member shall notify the other Members at least ten (10) days in advance of entering into a definitive agreement in connection with a proposed Sale Transaction. In any such agreement, the other Members will be required to make the same representations, warranties, covenants, indemnities and agreements the Class A Common Member agrees to make in connection with the proposed Sale Transaction.

3.08 Repurchase Right Upon Bankruptcy or Other Involuntary Transfer or Member Expulsion.

(a) Repurchase. Notwithstanding anything to the contrary in this Agreement, subject to Applicable Law;

(i) upon the occurrence of the Bankruptcy Action or any other Involuntary Transfer with respect to a Member (other than a Manager), such Member (hereinafter referred to as the "*Involuntary Member Transferee*") shall immediately provide written notice (the "*Initial Notice*") of such Bankruptcy Action or Involuntary Transfer to the Company, and the Company shall have the first right and option to repurchase all or any portion of the Units held by the Involuntary Member Transferee or its Transferee as of the date of such Bankruptcy Action or Involuntary Transfer. In the event that the Company does not elect to repurchase 100% of such Units, then the Company shall have the right to assign to a third party selected by the Managers, the right to purchase such remaining Units; provided, however, the Company and/or the Company's assignee(s) (as applicable) shall only have the right and option to repurchase all or any portion of the Units transferred by the Involuntary Member Transferee to his or her Transferee as a result of such Bankruptcy Action or Involuntary Transfer. In addition, upon the Bankruptcy Action or an Involuntary Transfer of Units with respect to such Transferee, the Company and/or the Company's assignee(s) (as applicable) shall have the right and option to repurchase all or any portion of the Units held by the Involuntary Member Transferee as of the date of such Bankruptcy Action or Involuntary Transfer in accordance with the provisions of this **Section 3.08**.

(ii) Upon the expulsion of a Member (an "*Expelled Member*") in accordance with **Section 2.02(f)**, to the extent that the Company does not exercise rights specified in **Section 3.08(a)(i)**, the Company may repurchase all or any portion of the Units then held by the Expelled Member (an "*Expulsion Repurchase*"). In the event that the Company does not elect to repurchase 100% of such Units, then the Company shall have the right to assign to a third party selected by the Managers, the right to purchase such remaining Units in accordance with the provisions of this **Section 3.08**. In the event that neither the Company nor an approved third party purchases any of such Expelled Member's Units, the Company shall retain an option to purchase such Units at any time for the Repurchase Value established at the time of expulsion; and the Expelled Member's Units shall be stripped of all rights and powers other than the right to receive distributions allocations and distributions pursuant to **Sections 7.03** and **7.05**, which obligations shall be considered contractual, independent of any rights to being a Member. To the extent that the Expelled Member establishes that they were improperly expelled, the purchase of such Member's Units pursuant to this **Section 3.08(a)(ii)** shall be rescinded, with all applicable parties receiving from such Member a return of any purchase consideration provided to such Member pursuant to this **Section 3.08(a)(ii)**.

(b) Repurchase Price. The aggregate purchase price of the Units subject to the Involuntary Transfer Repurchase or Expulsion Repurchase shall be equal to the Repurchase Value of such Units as of the date of such Bankruptcy Action, Involuntary Transfer or expulsion.

(c) Closing Procedure. The Company and/or the Company's assignee(s) (as applicable) shall effect the Involuntary Transfer Repurchase or Expulsion Repurchase (if so elected) by delivering or mailing to the Involuntary Member Transferee (and/or, if applicable, any Transferees thereof), or, the Expelled Member, as applicable, written notice (a "*Repurchase Notice*"). The Repurchase Notice may be provided by the Company (i) to the Involuntary Member Transferee at any time, but will, if applicable, be provided by the Company within ninety (90) days after the Company's receipt of any applicable Initial Notice and (ii) to an Expelled Member at any time following the provision of notice to such Expelled Member pursuant to **Section 2.02(f)**. The Repurchase Notice shall, provide a date within 90 days following the date upon which such Repurchase Notice is received by the Involuntary Member Transferee or Expelled Member, as applicable (the "*Repurchase Closing Date*"). Upon such Repurchase Closing Date, the Company and/or the Company's assignee(s) (as applicable) shall each deliver to the Involuntary Member Transferee or Expelled Member a check for the Repurchase Value of the Units being repurchased; provided, however, that any such purchaser of such Units may, at its sole option, pay the Repurchase Value for such Units by either (i) offsetting and canceling any indebtedness then owed by the Involuntary Member Transferee to the Company and/or (ii) by promissory note, which shall be payable in

equal annual installments of principal plus accrued interest over a five (5) year term, commencing on the first anniversary of the Involuntary Transfer Closing Date, with no pre-payment penalty, and shall bear interest compounded semi-annually at the prime rate announced by Citibank, N.A. (or its successors) as published in The Wall Street Journal at the time of delivery of such promissory note. Notwithstanding any default in payment of funds, the purchase of the of a Member's Units pursuant to this **Section 3.08** shall not be subject to rescission (other than, with respect to Section 3.08(a)(ii), through establishment of improper expulsion). The repurchase and sale arrangements contemplated by this **Section 3.08(a)** are referred to herein as an "*Involuntary Transfer Repurchase*".

3.09 Termination. All rights under **Sections 3.06**, **3.07**, and **3.08** shall terminate in the event the Company determines to undertake and completes an Initial Public Offering.

3.10 Assignment of Rights. The rights of the Members set forth in this Agreement are transferable to each Permitted Transferee of Units held by such Member pursuant to a Transfer made in accordance with this Agreement. Each such subsequent holder of Units must execute a Joinder Agreement and consent in writing to be bound by the terms and conditions of this Agreement in order to acquire any and all of the rights granted pursuant to this Agreement.

## ARTICLE IV - MANAGEMENT OF COMPANY

4.01 Management of the Company by Managers.

(a) The management and control of the business and affairs of the Company shall rest exclusively with Managers who initially shall be as set forth in this **Section 4.01**. The Managers shall have the general powers and duties of management typically vested in the directors of a corporation. The Managers shall be appointed by vote or written consent of the holders of no less than a majority of the Class A Common Units then outstanding. The Members hereby consent to the exercise by the Managers of the powers conferred upon it by the Act and this Agreement. To the extent that, at any particular time, there is more than one Manager, only those acts approved or consented to by a majority of such active Managers, shall be deemed to be the acts of such respective Managers. To the extent that, at any particular time, there is more than one Manager, the Managers collectively shall be deemed to consent to any act of any single Manager that is in accordance with the terms of this Agreement unless, with respect to any action that could reasonably be expected to have a material effect on the Company's business, within five (5) days of a Manager being informed of the action (which information may be verbal), the Managers give a written notice of objection to any other Manager, specifying the objection to the particular action. Upon the giving of any such notice, the Managers shall discuss the action as soon as reasonably practicable in order to try to resolve the issue. If no resolution is reached within three (3) days following the start of such discussion, then to the fullest extent possible under prevailing laws, the action shall be rescinded. The Company shall have between one (1) and five (5) Managers. The Manager on the Effective Date shall be Joseph Cohen.

(b) Notwithstanding any other provision in this Agreement to the contrary, the Managers shall not do any of the following without the consent or approval of the Class A Common Members holding at least a majority of the Class A Common Units:

(i) the sale, lease, transfer, exchange, liquidation or other disposition of all or substantially all of the Company's business or assets in any single transaction or in a series of related transactions;

(ii) any merger or consolidation or other business combination involving the Company or any similar transaction (other than a merger of any subsidiary of the Company into the Company); or any other act which would make it difficult to carry on the ordinary business of the Company;

(iii) do any act which would materially alter the business of the Company, engage in any new lines of business or make it impossible to carry on the ordinary business of the Company; or

(iv) commingle the Company funds with the funds of any other Person.

4.02 Resignation/Removal/Vacancy. A Manager may resign at any time by giving at least thirty (30) days' notice to the Class A Common Members and the Company. A Manager may be removed at any time, with or without cause, by a vote or written consent of Members holding more than a majority of the Class A Common Units then outstanding by giving written notice to the Company and the removed Manager, and shall be effective immediately. Notwithstanding the preceding two (2) sentences, no resignation or removal pursuant to this **Section 4.02** shall be effective until a successor Manager has been appointed pursuant to **Section 4.01**. A vacancy in the office of Manager shall be filled as soon as reasonably possible in accordance with **Section 4.01**. If a Manager is also a Member, its resignation/removal shall not, by itself, affect its rights as a Member and shall not constitute its withdrawal as a Member.

4.03 Company Expenses. All administrative, operating, accounting and legal expenses of the Company, as well as any other expenses incurred by the Managers on behalf of the Company, shall be borne by the Company, and, if necessary, shall be reimbursed by the Company upon presentation to the Managers of appropriate receipts therefor. Unless expressly provided in this Agreement or as approved by the Managers, no Member shall be entitled to reimbursement or credit from the Company for any cost or expense said Member has incurred or paid on behalf of the Company while acting solely in the capacity of a Member.

4.04 Exclusivity and Limitation of Liability of Managers. The Managers shall not be required to manage the Company as its sole and exclusive endeavor and the Company and other Members hereby acknowledge that the Managers have other business interests and may engage in other activities in addition to those relating to the Company. Except as otherwise provided by Applicable Law or expressly in this Agreement, none of the Managers nor any Person acting on their behalf shall be obligated personally for any debt, obligation or liability of the Company or of any Member, whether arising in contract, tort or otherwise, solely by reason of being or acting as Managers or on their behalf.

4.05 Devotion of Time; Compensation. The Managers shall devote such time as it shall reasonably determine in its sole and absolute discretion to be necessary to fulfil its responsibilities to the Company. Notwithstanding the preceding sentence, no Person shall be required to devote any set amount of time to the Company unless provided otherwise in a separate written agreement. The Managers shall be entitled to compensation for its services in such amounts as may be determined by the Managers or any compensation committee appointed by the Managers for such purpose from time to time, provided, that such compensation be fair and reasonable to the Company and at least as favorable to the Company as the level of compensation that would generally be paid by the Company operating at arms' length with respect to Persons capable of performing similar services as the Managers.

4.06 Committees/Subordinate Officers. The Managers may by resolution from time to time designate one or more committees consisting of one or more Managers which, to the extent provided in such resolution or resolutions, shall have and may exercise, subject to the provisions of this Agreement, the powers and authority of the Managers granted hereunder. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Managers. The Managers shall have power to change the members of any such committee at any time to fill vacancies, and to discharge any such committee, either with or without cause, at any time.

4.07 Other Activities. Each of the Members (a) recognizes that the Managers and their respective Affiliates and their respective direct or indirect members, partners, shareholders, principals, officers, directors, employees, agents, representatives and Affiliates, have or may in the future have other business interests, activities and investments, some of which may be in conflict or competition with the business of the Company, and that such Affiliates and other Persons are entitled to carry on such other business interests, activities and investments, and (b) agrees that (i) none of the Company, its subsidiaries or any Member (or any Affiliate of any Member) shall have any right, by virtue of this Agreement, in or to such activities, or the income or profits derived therefrom, and the pursuit of such activities, even if competitive with the business of the Company or any of its subsidiaries, shall not be deemed wrongful or improper, (ii) neither this Agreement nor any activity undertaken on behalf of the Company shall prevent the Managers and their respective Affiliates, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company or any of its subsidiaries, and (iii) neither the Managers nor any of their respective Affiliates shall have any obligation to account to the Company, any of its subsidiaries or to one another for any profits or other benefits derived from other activities, businesses or investments.

4.08 Transactions with Affiliates. Nothing in this Agreement shall preclude any transactions between the Company and any Member or an Affiliate of any Member acting for its own account, provided, that any services performed or products provided by the Members or any such Affiliate are services and/or products that the Managers reasonably believe, at the time of requesting such services, to be in the best interests of the Company, and that any transaction between the Company and any Member or Affiliate of any Member be on reasonable terms as would be entered into by unrelated parties bargaining at arms' length. The Managers shall be entitled to be reimbursed for all reasonable out-of-pocket expenses, disbursements and advancements they pay or incur in connection with the business of the Company.

4.09 Officers. The Managers may appoint or remove a Chief Executive Officer, President, Vice-President, Secretary, Chief Financial Officer, and such other officers of the Company as shall be necessary or desirable to further the business and objectives of the Company, each of whom shall hold office for such period, have such authority and perform such duties as are provided in a written agreement between the Company and such officer. Additionally, the Chief Executive Officer or President may delegate to or retract from subordinate officers such of the their powers and authority as the President determines to be in the best interest of the Company.

4.10 Deadlock Resolution. If there are an even number of Managers, and in the event that with respect to any decision that is reasonably expected to have a direct material effect on the Company's financial health or prospects, the Managers are deadlocked, or have otherwise reached an impasse, the Managers shall as quickly as reasonably practical arrange to present such matter to the Class A Common Members for resolution by majority vote or written consent.

## ARTICLE V - INDEMNIFICATION

5.01 Exculpation of Covered Persons.

(a) Covered Persons. As used herein, the term "*Covered Person*" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Manager and each officer, employee, agent or representative of the Company.

(b) Standard of Care. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken

by such Covered Person in good-faith or in reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person, and such Covered Person shall not be subject to any other or different standard imposed by this Agreement or by Applicable Law.

(c) Good Faith Reliance. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Profits or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) the Managers; (ii) one or more officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Act.

5.02 Indemnification by Company.

(a) To the fullest extent permitted under Act (after waiving all restrictions on indemnification other than those which cannot be eliminated under Act), as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution, or replacement, only to the extent that such amendment, substitution, or replacement permits the Company to provide broader indemnification rights than Act permitted the Company to provide before such amendment, substitution, or replacement), the Company shall indemnify, hold harmless, defend, pay, and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines, or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "*Losses*") to which such Covered Person may become subject by reason of:

(i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company or any of its direct or indirect subsidiaries solely to the extent arising from the Company's operations; or

(ii) such Covered Person being or acting in connection with the business of the Company as a member, shareholder, partner, Affiliate, manager, director, officer, employee, agent, or representative of the Company, any Member, the Managers, or any of their respective Affiliates, or such Covered Person serving or having served at the request of the Company as a member, manager, director, officer, employee, agent, or representative of any Person including the Company; provided, that such Loss did not arise from (x) the Covered Person's conduct involving bad faith, willful or intentional misconduct, or a knowing violation of law, or (y) a transaction from which such Covered Person derived an improper personal benefit, or (d) a breach of such Covered Person's duties or obligations under Act (taking into account any restriction, expansion, or elimination of such duties and obligations provided for in this Agreement).

(b) Subject to the foregoing Section, the Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this **Section 5.02**; provided, that if it is finally judicially determined that such

Covered Person is not entitled to the indemnification provided by this **Section 5.02**, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c) Any payment by the Company to a Covered Person hereunder shall be increased by an additional amount sufficient to pay all applicable income taxes (if any) of any jurisdiction paid by such Covered Person with respect to the total amount (including both the initial amount and such additional amount) paid to such Covered Person under this **Section 5.02**.

(d) The indemnification provided by this **Section 5.02** shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this **Section 5.02** shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this **Section 5.02** and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(e) To the extent that insurance from third parties has been obtained and is available in respect of any Losses to which a Covered Person is entitled to indemnification pursuant to this **Section 5.02**, the amount of such Losses shall be reduced by any amount actually recovered by such Covered Person from such third parties (to the extent such reimbursement was not taken into account in assessing the amount of Losses incurred by such Covered Person) rather than having the Company make any payments pursuant to the indemnification obligations contained herein, provided that if such proceeds are not readily available, the Managers will cause the Company to pay such Losses, in which event the Company shall be entitled to reimbursement therefor out of the proceeds of insurance when and if obtained. To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Managers, in their sole and absolute discretion, may determine; provided, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f) Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this **Section 5.02** shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise expressly agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(g) If this **Section 5.02** or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this **Section 5.02** to the fullest extent permitted by any applicable portion of this **Section 5.02** that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(h) The provisions of this **Section 5.02** shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this **Section 5.02** is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this **Section 5.02** that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to

such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

5.03 Survival. The provisions of this **Article V** shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE VI - CAPITAL CONTRIBUTIONS

6.01 Capital Contributions, Generally. All Capital Contributions shall be set forth in the books and records of the Company, as updated by the Managers from time to time. Subject to the terms and conditions of this Agreement, the Managers and any other Member may agree pursuant to a written subscription or similar agreement that such Member's Capital Contribution will be made over time on such terms and conditions as the Managers and such Member agree.

6.02 Initial Capital Contributions. The initial Capital Contributions of the Members (each, an "*Initial Capital Contribution*") shall be credited to the Capital Account of the appropriate Member and shall be set forth in the books and records of the Company, as updated by the Managers from time to time. Each Member agrees that he, she or it will duly execute and deliver to the Company any additional documents and instruments that the Managers may reasonably determine to be necessary to confirm the title of the Company in and to the property contributed to it as said Member's Initial Capital Contribution.

6.03 Additional Capital Contributions. Except as may be set forth in a written agreement between the Company and any Member, no Member shall have any duty or responsibility to make any additional Capital Contributions to the Company or to otherwise loan or advance any money or property to the Company. In addition, no Member shall be required upon the liquidation and winding up of the Company to contribute to the capital of the Company the amount of the negative balance, if any, in his Capital Account unless said Member expressly agrees in writing otherwise.

6.04 Return of Capital Contributions. Except as provided in **Section 7.03**, no Member shall be entitled to the return of any part of its Capital Contribution(s) or to otherwise withdraw profits, gains or capital from the Company other than as set forth in this Agreement. No Member shall have any liability for the repayment of the Capital Contribution(s) of any other Member and each Member shall look only to the assets of the Company for return of his Capital Contribution(s).

6.05 Member Loans. Any Member or an Affiliate of a Member may make a loan to the Company (each, a "*Member Loan*") if requested in writing by the Managers, to the extent required to pay the Company's operating or capital expenses, including debt service. Any Member Loan shall bear interest at the prime rate announced from time to time by Citibank, N.A. (or its successors) as published in The Wall Street Journal plus two percent (2%). All Member Loans shall be (i) unsecured, and (ii) repaid in full, including accrued interest, out of distributions that would otherwise be made to the Members pursuant to the waterfall set forth in **Section 7.03** (Member Loans which have been outstanding the longest shall be repaid first and if two (2) or more Members have Member Loans which have been outstanding for equal periods, repayment of such Member Loans shall be made *pro rata*, in proportion to such Members' then respective Member Loan balances, with payments first repaying accrued but unpaid interest (if any) and then repaying principal). Each Member Loan shall be evidenced by a promissory note, issued by the Company, specifying the above terms and conditions together with such other terms as the Managers may determine in good faith.

## ARTICLE VII - ALLOCATIONS AND DISTRIBUTIONS

7.01 Capital Accounts - Generally.

(a) Maintenance. A capital account ("*Capital Account*") shall be established and maintained for each Member in accordance with the rules as set forth in Treasury Regulations Section 1.704-1(b)(2)(iv). Each Member's Capital Account shall be increased by (i) the amount of money contributed by such Member to the Company, (ii) the Fair Market Value of any property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752 at the time of such contribution), and (iii) the amount of any Net Profits allocated to such Member. Each Member's Capital Account shall be decreased by (i) the amount of money distributed to such Member by the Company, (ii) the Fair Market Value of any property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752 at the time of such distribution), and (iii) the amount of any Net Losses charged to such Member. This provision and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and the Managers shall have the authority to interpret and apply the provisions of this **Article VII** and **Article IX** hereof in a manner consistent with such Treasury Regulations and any amendment or successor provision thereto and in accordance with the intent that the allocations have substantial economic effect and mirror the economic benefits as reflected in such **Articles VII** and **IX**. If the Managers reasonably determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Managers may authorize such modifications.

(b) No Duty to Restore Negative Balance in Capital Accounts. No Member shall have any responsibility to restore any negative balance in its Capital Account or to contribute to or in respect of the liabilities or obligations of the Company or to return distributions made by the Company except as required by Applicable Law.

(c) No Interest. Except as otherwise expressly provided herein, no interest shall be paid on any Member's Capital Account nor shall any Member be entitled to compensation with respect to his Capital Contributions or any services rendered on behalf of the Company except as approved by the Managers pursuant to the terms of this Agreement.

7.02 Allocations.

(a) Allocation of Net Profits Generally. Except as otherwise provided below, the Net Profits of the Company shall be allocated on a cumulative basis in one or more series of allocations, as follows: (i) first, in proportion to prior allocated Net Losses until utilized in full; and (ii) thereafter, *pro rata* in accordance with the Members' Units, all of which shall be subject to, and in compliance with, Applicable Law.

(b) Allocation of Net Losses Generally. Except as otherwise provided below, the Net Losses of the Company shall be allocated on a cumulative basis in one or more series of allocations, as follows: (i) in proportion to the Members' positive Capital Account balances until reduced to zero; (ii) in proportion to the Recourse Obligations, if any, until extinguished; and (iii) thereafter, in proportion to the Member's Percentage Interest. No Member shall have any responsibility to restore any negative balance in its Capital Account or to contribute to or in respect of the liabilities or obligations of the Company or to return distributions made by the Company except as required by Applicable Law.

(c) Special Allocations. In order to have the allocations made by the Company respected for federal income tax purposes, the following provisions required by the Treasury Regulations are adopted:

(i) The allocations required by Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations, relating to the definition of a qualified income offset shall be made.

(ii) Any Member's non-recourse deductions shall be specially allocated to the Member who bears the economic risk of loss with respect to such deductions as required by Treasury Regulations Section 1.704-2(i)(1).

(iii) The allocations required by the minimum gain charge-back requirements of Sections 1.704-2(f) and 1.704-2(i)(4) of the Treasury Regulations shall be made.

(iv) Any allocations of loss required by this Agreement that do not have economic effect as that term is defined in Section 1.704-1(b)(2)(ii) of the Treasury Regulations shall be reallocated among the Members in a manner that is consistent, to the extent possible, with this Agreement and that has economic effect.

(v) In the event that any allocations required by paragraphs (i) through (iv) are required to be made, the Net Profits and Net Losses of the Company shall be reallocated among the Members (to the extent consistent with the foregoing allocations) so that the allocations made pursuant to subparagraphs (i) through (iv) do not affect the economic arrangement of the Members, as reflected by the other provisions of this Agreement.

7.03 Distributions.

(a) General. All decisions with regard to the amount and timing of distributions by the Company shall be made by the Managers, in their sole and absolute discretion. Distributions shall be made only to the extent that funds are legally available therefor and may be limited and repayable as provided in the Act. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to Members if such distribution would violate Applicable Law.

(b) Order of Priority. Except for distributions in connection with a Liquidation Event, which are governed by the provisions of **Section 9.02**, and subject to **Section 7.04** and **Section 7.05**, all funds and assets of the Company which are determined by the Managers, in their sole and absolute discretion, to be available for distribution or payment, whether distributed as one distribution or a series of distributions, shall be distributed to the Members in accordance with the following order of priority: first, to the payment of any then-outstanding Members Loans; second, to the Members until such Members have received, from all distributions, an amount equal to their Unreturned Capital Contribution; and thereafter, to the Members *pro rata* and *pari passu* in accordance with their respective Percentage Interests.

(c) Rights of Members in Respect of Distributions. No Member shall be entitled to any distribution or payment with respect to such Member's Membership Interest in the Company except as set forth in this Agreement. Notwithstanding the nature of its Capital Contribution(s), no Member shall have the right to demand and receive property other than cash as a distribution from the Company.

(d) Limitations on Liability of Managers. Upon a good faith distribution of funds in the manner expressly provided in this **Section 7.03**, the Managers shall incur no liability on account of such distributions, even though such distributions may result in the Company's retaining insufficient funds for the operation of its business, which insufficiency may result in a loss to the Company or necessitate the borrowing of funds by the Company.

7.04 Tax Distributions. To the extent permitted by Applicable Law and subject to the availability of sufficient cash flow, for any quarter during a fiscal year, the Company shall make a

distribution to the Members of an amount of cash ( "*Tax Distribution(s)*") which in the reasonable judgment of the Managers equals the highest applicable tax rate generally applicable to the Members multiplied by the amount of taxable income, if any, allocable to the Members in respect of such quarter, with such distribution to be made to the Members in the same proportions that taxable income was allocable to the Members during such quarter. No Member shall be entitled to receive a distribution with respect to any employment or self-employment taxes due by the Member. Further, no Tax Distributions will be paid during the dissolution and liquidation of the Company. Tax Distributions shall be treated as advances of any amounts Members are entitled to receive pursuant to **Section 7.03(b)** or **Section 9.02(c)(iii)**.

7.05 Liquidating Distributions; Allocations Upon Liquidation Event.

(a) Liquidating Distributions. Upon a Liquidation Event, liquidating distributions shall be made to the Members in the order of priority set forth in **Section 9.02**. The Company may offset damages for breach of this Agreement by a Member whose Membership Interest is liquidated against the amount otherwise distributable to such Member.

(b) Allocations Upon Liquidation Event. The parties intend that, upon the occurrence of a Liquidation Event, the Members' Capital Account balances, as determined after taking into account all Capital Account adjustments for all periods other than liquidating distributions under **Section 9.02(c)**, equal the amount of such distributions to which the Members are entitled under **Section 9.02(c)** (the "*Target Balances*"). Net Profits and/or Net Losses of the Company for the year that includes the Liquidation Event (or, if necessary, items of gross income and deduction of the Company for that year) shall be allocated among the Members so as to cause the Members' Capital Account balances to equal the Target Balances. Net Profits and/or Net Losses for prior open years (or, if necessary, items of gross income and deduction of the Company for such years) may be reallocated among the Members to the extent it is not possible to achieve such result with allocations of items of income (including gross income) and deduction for the year in which the Liquidation Event occurs.

7.06 Guaranteed Payments. To the extent reasonably determined by the Managers, a Member may be entitled to receive a guaranteed payment within the meaning of Section 707(c) of the Code for the performance of services to the Company by the Member for being an officer or otherwise being involved in the management of the Company. Guaranteed payments made to a Member shall not be treated as a distribution to the Member under this Agreement.

7.07 Withholding. To the extent that the Company is required by law to withhold or to make tax or other payments on behalf of or with respect to any Member, the Company shall withhold such amounts from any distribution and make such payments as so required. For purposes of this Agreement, any such payments or withholdings shall be treated as a distribution to the Member on behalf of whom the withholding or payment was made. All such distributions shall be made only to the Persons who, according to the books and records of the Company, are the holders of record of the Membership Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor the Managers shall incur any liability for making distributions in accordance with this **Section 7.07**.

## ARTICLE VIII - ACCOUNTING; TAX MATTERS

8.01 Bank Accounts; Investments. Capital Contributions, revenues and any other Company funds shall be deposited by the Company in a bank account or accounts established in the name of the Company, or shall be invested by the Company, at the sole discretion of the Managers, in furtherance of the purposes of the Company. No other funds shall be deposited into Company bank accounts or commingled with Company investments. Funds deposited in the Company's bank accounts may be

withdrawn only to be invested in furtherance of the Company's purposes, to pay Company debts or obligations or to be distributed pursuant to the terms of this Agreement.

8.02 Tax Returns and Information. The Managers shall designate the "partnership representative" of the Company pursuant to Section 6223(a) of the Code (the "*Company Representative*"). If any state or local tax law provides for a tax matters partner, partnership representative or person having similar rights, powers, authority or obligations, the Company Representative shall also serve in such capacity. The Company Representative is authorized to represent the Company before the Internal Revenue Service and any other governmental agency with jurisdiction, and to sign such consents and to enter into settlements and other agreements with such agencies as the Company Representative deems necessary or advisable. The Company Representative shall make all decisions regarding permitted elections under the Code with respect to tax proceedings and the assessment of taxes by any taxing authority. The Company Representative shall keep the Managers reasonably informed of all proposed audits, examinations or other administrative and judicial proceedings involving the Company, as well as keep the Managers informed as to the status of any such audit, examination or other administrative or judicial proceeding. Notwithstanding anything to the contrary in this Agreement, each Member (including for purposes of this **Section 8.02**, any Person who is or becomes a Member but who for any reason ceases to be a Member) (i) hereby covenants to treat each item of income, gain, loss, deduction, or credit attributable to the Company in a manner consistent with the treatment of such income, gain, loss deduction, or credit on the tax return of the Company or as determined in a notice of final partnership adjustment pursuant to Section 6226 of the Code, (ii) hereby agrees to indemnify and hold harmless the Company from such Member's share of any tax and any penalties, interest and additions to tax attributable to any adjustment to the income, gain, loss, deduction, or credit of the Company pursuant to Section 6226 of the Code, and (iii) hereby agrees to take all other actions as the Company Representative may reasonably direct with respect to the Member's (or, in respect of the Member, the Company's) tax liabilities, including filing an amended return for any "reviewed year" to account for all adjustments under Section 6225(a) of the Code properly allocable to the Member as provided in and otherwise contemplated by Section 6225(c) of the Code and any Treasury Regulations that may be promulgated thereunder. The Company shall, to the fullest extent permitted by law, reimburse and indemnify the Company Representative for all expenses (including reasonable legal and accounting fees), claims, liabilities, losses and damages incurred as the Company Representative in connection with any examination, administrative or judicial proceeding, or otherwise; provided, however, that such indemnification from liability shall not apply to any liability for loss caused by any act or omission which arises out of the fraud, gross negligence, willful misconduct or intentional violation of applicable Law by the Company Representative. The provisions of this **Section 8.02** shall survive the termination or dissolution of the Company or the termination of any Member's interest in the Company, any transfer of a Member's interest in the Company or withdrawal as a Member and shall remain binding on the Member. Notwithstanding the foregoing, the Company Representative shall not cause the Company to elect to be taxed other than as a partnership.

8.03 Books and Records. The Company shall maintain such books and records as the Company may be required by the Act to maintain, in the manner and for no less than the time periods which the Act may require. The Company's books and records may be inspected by the Members in accordance with the provisions of the Act.

## ARTICLE IX - DISSOLUTION, LIQUIDATION, AND TERMINATION

9.01 Events of Dissolution; Effectiveness of Dissolution.

(a) The Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events (each, a "*Liquidation Event*"):

(i) The determination of the Managers, in their sole and absolute discretion;

(ii) An election to dissolve the Company made by the holders of a majority of the Class A Common Units then outstanding; or

(iii) Any (A) merger, consolidation, reorganization or acquisition of the Company (other than a merger, consolidation, reorganization or acquisition where the Company is the surviving company or the holders of all of the outstanding securities of the Company prior to such merger, consolidation, reorganization or acquisition hold more than fifty percent (50%) of the equity of the surviving company), (B) sale of all or substantially all of the assets of the Company, or (C) the effectuation by the Company of a transaction or series of related transactions (other than a Bona Fide Private Financing) in which more than fifty percent (50%) of the equity of the Company is issued, sold, transferred or otherwise disposed of; or

(iv) The entry of a decree of judicial dissolution under the Act.

(b) Dissolution of the Company shall be effective on the day on which the event described in **Section 9.01(a**) occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in **Section 9.02** and the Certificate of Dissolution/Cancellation is deemed effective under the Act. On the occurrence of an event described in **Section 9.01(a)**, the Liquidator (or, in the case of a dissolution pursuant to **Section 9.01(a)(iv)**, the persons conducting the winding up of the Company's affairs in accordance with applicable law) shall cause the filing of a Certificate of Dissolution/Cancellation pursuant to the Act.

9.02 Liquidation. If the Company is dissolved pursuant to **Section 9.01**, the Company shall be liquidated and its business and affairs wound up in accordance with the Act and the following provisions:

(a) Liquidator. The Managers, or a Person designated by the Managers, shall act as liquidator to wind up the Company (the "*Liquidator*"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b) Accounting. As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c) Distribution of Proceeds. The Liquidator shall liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i) *First*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii) *Second*, to the establishment of and additions to reserves that are determined by the Managers to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii) *Third*, to the Members in accordance with **Section 7.03(b)**.

(d) Discretion of Liquidator. Notwithstanding the provisions of **Section 9.02(c)** that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in **Section 9.02(c)**, if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of **Section 9.02(c)**, undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

9.03 Certificate of Cancellation. Upon completion of the distribution of Company assets as provided herein, the Liquidator shall file a Certificate of Dissolution/Cancellation, and shall cause the cancellation of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Nevada and shall take such other actions as may be necessary to terminate the Company.

9.04 Survival of Rights, Duties and Obligations. Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to **Article V**.

9.05 Recourse for Claims. Each Member shall look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Profits, Net Losses and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Managers, the Liquidator or any other Member.

9.06 Right to Convert to Corporate Form or to be Formed as a Corporation. Subject to the other terms of this Agreement, the Managers may cause the Company to convert to one or more corporations (the "*Continuing Corporation*"), through an Initial Public Offering or by such other means (including, without limitation, merger or consolidation or other business combination, transfer of all or a part of the Company's assets and/or transfer of the Members' respective Units) as the Managers may reasonably select. At the time of such conversion, each Unit will automatically be converted into shares of capital stock in such Continuing Corporation that shall represent an equity interest equivalent to such Member's equity interest in the Company (including, without limitation, having the same liquidation preferences, conversion rights, dividend rights, redemption rights and voting rights).

## ARTICLE X - GENERAL PROVISIONS

10.01 Notices. Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents required or permitted to be given under this Agreement must be in writing and shall be deemed to have been given (a) upon delivery to the recipient in person or by a nationally recognized courier, or (b) upon confirmed electronic transmission by or to the Company. Such notices, requests and consents shall be given (x) to Members at their addresses as set forth on the Members Schedule, or such other address as a Member may specify by notice to the Managers or to all of the other Members, (y) to the Company at the address of the principal office of Company specified in **Section 1.03**, or at such other location as the Company shall have specified by notice to the Members as its principal office, or (z) to the Managers at the business address set forth in the Members Schedule. Whenever any notice is required to

be given by law, the Articles or this Agreement, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated, shall be deemed equivalent to the giving of such notice.

10.02 Entire Agreement. This Agreement, together with the Schedules, Exhibits and Appendices hereto (which Schedules, Exhibits and Appendices are deemed a part of this Agreement), (i) contain the entire agreement and understanding of the parties with respect to the subject matter hereof and thereof, and (ii) supersede all prior negotiations, discussions, correspondence, communications, understandings and agreements between the parties and their Affiliates relating to the subject matter hereof and thereof and any rights or limited liability company or other interests herein any offering memorandum or other written or oral statement made by or on behalf of the Company in connection with any offering, including any offer or sale of any Units, all of which are merged into this Agreement.

10.03 Arbitration. Except as explicitly provided for otherwise herein, any controversy or claim arising under or in connection with this Agreement, or in connection with the validity, construction, performance, or purported breach of this Agreement, or in connection with the subject matter of this Agreement, shall be resolved by final, binding, and non-appealable arbitration conducted by a single arbitrator and administered by JAMS in Los Angeles, California, all in accordance with JAMS Streamlined Arbitration Rules and Procedures (the "*Rules*"), as they may be amended and in effect at the time the arbitration is filed, regardless of the amount in dispute, and judgment upon any award rendered by the arbitrator may be entered by any state or Federal court having jurisdiction thereof. To be clear, without limiting the previous sentence, the arbitration shall be commenced and the arbitrator shall be chosen in accordance with the procedures set forth in the Rules, which are incorporated herein and made a part of this Agreement by reference. The parties agree to accept service of process in accordance with the Rules. Further, the parties agree to abide by and perform any award rendered in any such arbitration, and agree that any court having jurisdiction over them may issue a judgment based upon the award. The prevailing party in any arbitration shall be entitled to reimbursement of all costs of the arbitration, including but not limited to filing fees and expenses, arbitrator fees and expenses, and reasonable attorneys' fees and expenses.

10.04 Amendment or Modification. This Agreement may be amended, restated, supplemented, modified or waived by the Managers, in their sole and absolute discretion; provided that (i) if any amendment, restatement, supplement, modification or waiver materially adversely affects any particular Member in a manner disproportionate to the other Members of the same class of Units, the written consent of such affected Member shall also be required and (ii) any amendment to either of **Article VII** or **Article IX** that would result in a decrease in the relative amounts to be distributed to the holders of any class of Units, the written consent of the holders of a majority of the then outstanding Units of such class shall also be required. Any amendment or modification to or waiver of this Agreement which receives the requisite approval or consent set forth in this **Section 10.04** shall be binding on the Company and all Members without any further action. The Articles may be amended, restated, supplemented, modified or waived by the Managers with the vote of not less than 50% of the Class A Common Units then outstanding.

10.05 Binding Effect. This Agreement is binding on and inures to the benefit of the parties and their respective heirs, legal representatives, successors and permitted assigns and transferees. If a Member which is not a natural person is dissolved or terminated, the successor of such Member shall be bound by the provisions of this Agreement.

10.06 Governing Law; Severability. This Agreement is governed by and shall be construed in accordance with the law of the State of Nevada (without regard to principles of conflicts of laws which might apply, the laws of any other jurisdiction) applicable to contracts made and to be performed within. In the event of a conflict between the provisions of this Agreement and any provision of the Articles or the Act, the applicable provision of this Agreement shall control, to the extent permitted by Applicable Law.

Any provision hereof which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by Applicable Law, the parties hereby waive any provision of law which may render any provision hereof void or unenforceable in any respect.

10.07 Further Assurances. In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions, as reasonably requested by the Managers.

10.08 Waiver of Certain Rights. Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company, for an accounting, for appointment of a liquidator, or for partition of the property of the Company. No course of dealing and no delay on the part of any party hereto in exercising any right, power or remedy conferred by this Agreement shall operate as a waiver thereof or otherwise prejudice such party's rights, powers and remedies. No single or partial exercise of any rights, powers or remedies conferred by this Agreement shall preclude any other or further exercise thereof or the exercise of any other right, power or remedy. No provision of, or any rights granted or remedies available under, this Agreement or any other agreements shall limit the availability of any other right or remedy for the breach or violation of any of the provisions contained in this Agreement or any such other agreements or documents.

10.09 Notice to Members of Provisions of this Agreement. By executing this Agreement, each Member acknowledges that such Member has actual notice of (a) all of the provisions of this Agreement and (b) all of the provisions of the Articles. Each Member hereby agrees that this Agreement constitutes adequate notice of all such provisions, and each Member hereby waives any requirement that any further notice hereunder be given.

10.10 Third Party Beneficiaries. The parties agree that the provisions of this Agreement are intended for the benefit of, and are enforceable by, each Member and their respective successors and permitted assigns and transferees. Except for the provisions of **Article V**, nothing in this Agreement shall be construed as giving any other Person any right, remedy or claim under or in respect of this Agreement or any provision hereof.

10.11 Interpretation. Titles or captions of Articles and Sections contained in this Agreement are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

10.12 Counterparts. This Agreement may be executed in any number of counterparts (each of which may be transmitted via electronic means) with the same effect as if all parties had signed the same document, all counterparts shall be construed together and shall constitute the same instrument, and all signatures need not appear on any one counterpart.

10.13 Confidentiality.

(a) Each Member acknowledges that during the term of this Agreement it will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, investments, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans,

marketing plans, contracts, customer lists, or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic, or any other form or medium) (collectively, "*Confidential Information*"). In addition, each Member acknowledges that (i) the Company has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information, (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace, and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member's monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b) Nothing contained in **Section 10.13(a)** shall prevent any Member from disclosing Confidential Information (i) on the order of any court or administrative agency, (ii) on the request or demand of any regulatory agency or authority having jurisdiction over such Member, (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories, or other discovery requests, (iv) to the extent necessary in connection with the exercise of any remedy hereunder, (v) to the Managers or the Company, (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this **Section 10.13** as if a Member, or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Membership Interests from such Member, if such potential Permitted Transferee agrees in writing to be bound by the provisions of this **Section 10.13** as if a Member before receiving such Confidential Information; provided, that in the case of clause (i), (ii), or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c) The restrictions of **Section 10.13(a)** shall not apply to Confidential Information that (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement, (ii) is or has been independently developed or conceived by such Member without use of Confidential Information, or (iii) becomes available to such Member or any of its representatives on a non-confidential basis from a source other than the Company, the other Members, or any of their respective representatives; provided, that such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d) The obligations of each Member under this **Section 10.13** shall survive for so long as such Member remains a Member, and for two (2) years following the earlier of (i) termination, dissolution, liquidation, and winding up of the Company, (ii) the dissociation of such Member from the Company, or (iii) such Member's Permitted Transfer of its Membership Interests; provided, that with respect to Confidential Information that constitutes a trade secret under Applicable Law, the obligations of each Member under this **Section 10.13** shall survive until, if ever, such Confidential Information loses its trade secret protection other than due, directly or indirectly, to an act or omission of the Member.

(e) Notwithstanding any other provision of this Agreement, including specifically, but without limitation **Section 10.02**, to the extent that any Member is also an employee or consultant to the Company and has in such capacity entered into a confidentiality, non-disclosure or similar agreement

(including as a provision in an employment or engagement agreement), such other agreement shall have full force and effect and this **Section 10.13** shall not apply.

10.14 Specific Performance. Each party hereto acknowledges that the provisions of **Article III**, and **Section 10.13** hereof shall be specifically enforceable, it being agreed by the parties that any remedy at law, including monetary damages, for breach of any such provision shall not be an adequate remedy and that any defense in any action for specific performance of any such provision that a remedy at law would be adequate is waived. The party seeking to enforce such provisions shall be entitled to recovery of all costs and expenses, including reasonable attorneys' fees and expenses, incurred in enforcing such provisions.

10.15 Spousal Consent. Upon the request of the Managers, to the extent necessitated by Applicable Law, each Member who has a Spouse on the date of this Agreement shall cause such Member's Spouse to execute and deliver to the Company a spousal consent in the form of **Exhibit B** hereto (a "*Spousal Consent*"), pursuant to which the Spouse acknowledges that he or she has read and understood the Agreement and agrees to be bound by its terms and conditions. If any Member should marry or engage in a Marital Relationship following the date of this Agreement, such Member shall cause his or her Spouse to execute and deliver to the Company a Spousal Consent within thirty (30) days thereof. A Spousal Consent shall not be deemed to confer or convey to a Spouse any rights in a Member's Membership Interests that do not otherwise exist by operation of law or agreement between the Member and his or her Spouse.

10.16 Advice of Counsel. Each party to this Agreement acknowledges that, in executing this Agreement, such party has had the opportunity to seek the advice of independent legal counsel, and has read and understood all of the terms and provisions of this Agreement. This Agreement shall not be construed against any party by reason of the drafting or preparation thereof.

10.17 Power of Attorney.

(a) By signing this Agreement, each Member hereby makes, constitutes and appoints the Managers with full power of substitution and resubstitution, his, her or its true and lawful agent or agents and attorney or attorneys-in-fact for him, her or it and in his, hers or its name, place and stead, to sign, execute, certify, acknowledge, file and record (i) all instruments amending, restating or canceling the Articles, as the same may hereafter be amended or restated, that may be appropriate and (ii) such other agreements, instruments, elections or documents as may be necessary or advisable (A) to reflect the admission to the Company of any additional Member in accordance with the terms hereof and (B) that may be required of the Company or of the Members by the Laws of Nevada or any other jurisdiction. Each Member authorizes such agent or attorney-in-fact to take any further action that such agent or attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such agent or attorney-in-fact full power and authority to do and perform each and every act or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Member might or could do if personally present, and hereby ratifying and confirming all that such agent or attorney-in-fact shall lawfully do or cause to be done by virtue hereof. Each Member shall provide to the Managers copies of all documents executed pursuant to the power of attorney contained in this **Section 10.17**.

(b) The power of attorney granted pursuant to this **Section 10.17**: (i) is a special power of attorney coupled with an interest and is irrevocable; (ii) may be exercised by such attorney-in-fact by listing all of the Members executing any agreement, certificate, instrument or document with the single signature of such attorney-in-fact acting as attorney-in-fact for all of them; and (iii) shall survive the assignment by a Member of its Membership Interest in the Company, except that where the assignee thereof is admitted as a Member, the power of attorney shall survive such assignment as to the assignor Member for the sole purpose of enabling such attorney-in-fact to execute, acknowledge and file any such agreement, certificate, instrument or document as is necessary to effect such admission.

[Remainder of Page Intentionally Blank.]

IN WITNESS WHEREOF, the undersigned has hereunto set its, his or her hand or caused this Agreement to be executed and delivered as of the Effective Date.

**THE COMPANY:**

**CONEY ISLAND PICNIC, LLC**

DocuSigned by: Joseph Cohen
15CA7B525576406...

By: ________________________
Name: Joseph Cohen
Title: Manager

**THE MEMBERS:**

**Joseph & Alona Cohen Family Trust**

DocuSigned by: Joseph Cohen (Trustee)
15CA7B525576406...

By: ____________________________
Name:
Title: Trustee

**Isaac G. Cohen Living Trust**

DocuSigned by:
7B12DF55E28F4BA...

By: ____________________________
Name:
Title: Trustee

DocuSigned by: Jonathan Knapp
B9882DDF8B2A43E...

____________________________
Name: Jonathan Knapp

**CONEY ISLAND PICNIC, LLC**

**OPERATING AGREEMENT**

APPENDIX A

1. Defined Terms. When used in the Operating Agreement of Coney Island Picnic, LLC, a Nevada limited liability company, to which this Appendix A is attached and part of (the "*Agreement*"), the following terms shall have the meanings set forth below (all terms used in the Agreement that are not defined in this Appendix A shall have the meanings set forth elsewhere in the Agreement):

"*Act*": is defined in **Section 1.02**.

"*Affiliate*": means, as to any Person (or when not referring to a specific Person shall mean an Affiliate of a Member), (a) any other Person that, directly or indirectly, through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person; (b) the officers, directors, members, managers or partners of such Person or the beneficial owner of 25% or more of any class of equity securities of such Person; (c) if such Person is an officer, director, member, manager or partner, any entity for which such Person acts in any such capacity; and (d) any relative (by blood, adoption or marriage) within the second degree of any such Person or of any Person described in clauses (a) and (b) above.

"*Agreement*": is defined in the preamble to this Agreement.

"*Applicable Law*": means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any governmental authority; (b) any consents or approvals of any governmental authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any governmental authority.

"*Articles*": is defined in the Recitals to this Agreement.

"*Bad Acts*" means, with respect to any Member (including any Person who Controls such Member), (a) fraud, willful misconduct, gross negligence, and/or conviction of a felony (or guilty plea or *nolo contendere* plea in connection with any felony) on the part of such Member that involves both (i) a breach of trust, theft or crime of moral turpitude and (ii) relates to the Company or its subsidiaries; (b) a Bankruptcy Bad Act; (c) wrongful conduct that has adversely affected, or is likely to adversely affect, the Company's business other than non-material wrongful conduct; (d) the willful or persistent breach of this Agreement, any other agreement between the Company or any Affiliate of the Company and such Member, or such Member's obligations under the Act, in each case, in each case, other than non-material items; and/or (e) conduct relating to the Company's activities that makes it not reasonably practicable to carry on such activities with such Person as a Member.

"*Bankruptcy Action*" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under the Bankruptcy Code or any similar statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, (g) colludes or conspires with any other Person with respect to any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under the Bankruptcy Code or any similar statute, law or regulation, or (h) if ninety (90) days

after the commencement of any proceeding against the Person (and not described in clause (g) above) seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under the Bankruptcy Code or any similar statute, law or regulation, the proceeding has not been dismissed, or if within ninety (90) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Code.

"*Bankruptcy Bad Act*" means, with respect to any Member, (a) a Bankruptcy Action with respect to such Member or any owner of a direct or indirect equity interest therein and/or (b) a voluntary or collusive Bankruptcy Action with respect to the Company or any subsidiary that results from an action taken by such Member or any Person Controlling such Member without the prior written approval of all Members; provided, however, that in no event shall a Bankruptcy Bad Act include an involuntary bankruptcy proceeding against a Member in which another Member participated as a petitioning creditor.

"*Bankruptcy Code*" means Title 11 of the United States Code entitled "Bankruptcy," as amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights.

"*Bona Fide Private Financing*" means a transaction in which the Company receives from any non-Affiliate third party cash in exchange for equity or options, warrants, debt instruments or other rights to acquire any equity upon exercise, exchange or conversion thereof in respect of which the Company and its subsidiaries use the proceeds received in such transaction entirely and solely for the purpose of growth capital invested into the Company or repayment of debt obligations held by non-Affiliate third parties and not for distribution or other payment to any Member or Non-Subsidiary Affiliate.

"*Book Value*": means, with respect to any property of the Company, such property's adjusted basis for federal income tax purposes, except as follows:

(a) The initial Book Value of any property contributed by a Member to the Company shall be the Fair Market Value of such property as of the date of such contribution;

(b) The Book Values of all properties shall be adjusted to equal their respective Fair Market Values in connection with (i) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution to the Company or in exchange for the performance of services to or for the benefit of the Company, (ii) the distribution by the Company to a Member of more than a *de minimis* amount of property as consideration for an interest in the Company, (iii) the liquidation of the Company within the meaning of Treasury Regulation Section 1.704-1(b)(2)(ii)(g) (other than pursuant to Section 708(b)(1)(B) of the Code), or (iv) any other date believed by the Managers to be appropriate so as to properly reflect the relative economic interests of the Members in the Company;

(c) The Book Value of property distributed to a Member shall be the Fair Market Value of such property as of the date of such distribution;

(d) The Book Value of all property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such property pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m); and

(e) If the Book Value of property has been determined or adjusted pursuant to clause (a), (b) or (d) hereof, such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such property for purposes of computing Net Profits and Net Losses and other items allocated pursuant to **Section 7.02**.

"*Business Day*": means a day other than a Saturday, Sunday or other day on which commercial banks in the State of Nevada are authorized or required to close.

"*Capital Account*": is defined in **Section 7.01(a)**.

"*Capital Contribution*": means, with respect to any Member, the amount of any money and the initial Book Value of any other property contributed to the capital of the Company by such Member, including any Initial Capital Contributions.

"*Class A Common Member*": means a holder of Class A Common Units.

"*Class A Common Units*": means a Unit representing a fractional portion of the Membership Interests of the Members and having the rights and obligations specified with respect to the Class A Common Units in this Agreement.

"*Code*": means the Internal Revenue Code of 1986, as amended.

"*Company*": means Coney Island Picnic, LLC, a Nevada limited liability company.

"*Company Representative*": is defined in **Section 8.02**.

"*Confidential Information*": is defined in **Section 10.13**.

"*Continuing Corporation*": is defined in **Section 9.06**.

"*Controlling,*" "*Controls,*" "*Controlled by*" and "*under common Control with*" mean, with respect to a corporation or limited liability company, the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled individual or entity.

"*Covered Person*": is defined in **Section 5.01(a)**.

"*Depreciation*": means, for each fiscal year of the Company or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to property for such fiscal year or other period, except that with respect to any property the Book Value of which differs from its adjusted tax basis at the beginning of such fiscal year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such fiscal year or other period bears to such beginning adjusted tax basis; provided that if the adjusted tax basis of any property at the beginning of such fiscal year or other period is zero, Depreciation with respect to such property shall be determined with reference to such beginning value using any reasonable method selected by the Managers.

"*Divorce*" means any legal proceeding to terminate, dissolve, or separate the Marital Relationship of a Member, and includes an action for annulment, legal separation, or similar proceeding that involves a judicial division of community or quasi-community property of the Member and the Member's Spouse.

"*Economic Interest*": means a Person's right to share in the income, gains, losses, deductions, credit or similar items of, and to receive distributions from, the Company, but does not include any other rights of a Member.

"*Effective Date*": is defined in the preamble to this Agreement.

"*Electing Tag-Along Member*": is defined in **Section 3.06(c)**.

"*Entity*": means a general partnership, a limited partnership, a domestic or foreign limited liability company, a trust, an estate, an association, a corporation or any other legal or commercial entity.

"*Expelled Member*": is defined in **Section 3.08(a)(ii)**.

"*Expulsion Repurchase*": is defined in **Section 3.08(a)(ii)**.

"*Family Member(s)*": means, with respect to any natural Person, any immediate family member of such Person, including include any Spouse, lineal ancestor or descendant, brother or sister, of such Person.

"*Incapacity*" or "*Incapacitated*" means (a) with respect to any individual, the entry of a court order declaring such individual legally incompetent or incapable of handling his affairs, the appointment by court order of a guardian or conservator for such individual upon an adjudication of such individual's incompetence or his death or (b) with respect to any other Person, the dissolution or termination of such Person (other than by merger or consolidation).

"*Initial Capital Contribution*": is defined in **Section 6.02**.

"*Initial Notice*" is defined in **Section 3.08(a)(i)**.

"*Initial Public Offering*": shall mean any of the following: (a) an underwritten public offering of ownership interests in the Company or any successor thereof; (b) a reverse triangular merger with a publicly traded company; or (c) any substantially equivalent transaction under which it or its successor becomes a publicly traded company.

"*Involuntary Member Transferee*": is defined in **Section 3.08(a)(i)**.

"*Involuntary Transfer*": means any potential Transfer of Units in connection with (a) death or Incapacity of a Member, (b) a property settlement in a Divorce proceeding, (c) the Marital Relationship of a Member terminating by death of the Member's Spouse or by Divorce, and the Member does not succeed to all of the Spouse's interest in the Membership Interests held by the Member at such time; (d) pursuant to a court order; (e) a Member being dissolved or subject to a Bankruptcy Action; or (f) under any other circumstances whereby a Member would be deprived of his ownership of Units on an involuntary basis.

"*Involuntary Transfer Repurchase*": is defined in **Section 3.08(a)**.

"*Joinder Agreement*": means the Joinder Agreement in form and substance attached to this Agreement as Exhibit A.

"*Liquidation Event*": is defined in **Section 9.01(a)**.

"*Liquidator*": is defined in **Section 9.02(a)**.

"*Losses*": is defined in **Section 5.02(a)**.

"*Manager*": means the Manager or Managers designated as provided in **Article IV** (plural is used throughout Agreement even if only one (1) Manager is designated at any certain time).

"*Marital Relationship*": means a civil union, registered domestic partnership, marriage, or any other similar relationship that is legally recognized in any jurisdiction.

"*Member*" or "*Members*": is defined in the preamble to this Agreement.

"*Member Loan*": is defined in **Section 6.05**.

"*Members Schedule*": is defined in **Section 2.01(a)**.

"*Membership Interest*": means a Member's entire limited liability company interest in the Company, including such Member's Economic Interest, right to vote and to participate in the management of the Company, and the right to information concerning the business and affairs of the Company.

"*Net Profits*" and "*Net Losses*": mean, for any fiscal year, an amount equal to the Company's taxable income or loss, respectively, for such fiscal period, determined in accordance with Section 703(a) of the Code, including, without limitation, each item of Company income, gain, loss, deduction or credit (as adjusted to take into account income that is exempt from federal income tax and expenditures of the Company described in Code Section 705(a)(2)(B) not deductible in computing its taxable income and not properly chargeable to Capital Accounts).

"*New Units*": is defined in **Section 2.01(d)**.

*"Percentage Interest"* means in respect to a Member's Units or any class thereof, the percentage of all then outstanding Units or applicable class of Units comprised of the Units (or applicable class thereof) then held by such Member, which shall be calculated by multiplying (i) the quotient resulting from division of (x) the number of Units (or applicable class thereof) then held by such Member by (y) the total number of Units (or class thereof) of the Company then outstanding by (ii) one hundred (100).

"*Permitted Transfer*": is defined in **Section 3.01**.

"*Permitted Transferee*": means, (i) a Wholly-Owned Affiliate of the Transferring Member to the extent Transferring Member is not a natural Person; (ii) a revocable trust under which the distribution of Units may be made only to the Transferring Member and/or a Family Member of such Transferring Member, and in respect of which the Transferring Member is acting as trustee; (iii) a charitable remainder trust, the income from which will be paid to the Transferring Member and/or any Family Member of the Transferring member during his/their life and in respect of which the Transferring Member is acting as trustee; and (iv) any Person to whom any Member has Transferred any Units in compliance with and pursuant to the terms of this Agreement, including by way of any Involuntary Transfer with respect to which the Company did not exercise its rights to an Involuntary Transfer Repurchase.

"*Person*": means a natural person, trust, estate, partnership (whether general or limited or whether domestic or foreign), joint venture, association, limited liability company, foreign limited liability company, corporation, custodian, nominee or any other individual or Entity in its own or any representative capacity.

"*Proposed Tag-Along Transfer*": is defined in **Section 3.06(a)**.

"*Repurchase Closing Date*": is defined in **Section 3.08(c)**.

"*Repurchase Notice*": is defined in **Section 3.08(c)**.

"*Recourse Obligations*": means any and all obligations for which any Member or Affiliate of any Member became liable arising out of any default by the Company, whether by endorsement or guaranty, and any obligations owed to any Member or Affiliate of any Member by the Company pursuant to any and all loans from said Member or any Affiliate thereof to the Company.

"*Repurchase Value*": means the aggregate purchase price the selling holder of the Units would be entitled to receive upon a liquidation of the Company, in accordance with **Section 9.02(c)**, assuming all of the assets of the Company are sold for a purchase price per Unit equal to the product of (i) such holder's Percentage Interest and (ii) (A) (I) the Company's EBITDA for the most recently completed fiscal year, *multiplied by* (II) 6, *minus* (B) the aggregate amount of the Company's long-term indebtedness at and as of the end of the most recently completed fiscal year. For purposes of this definition, "*EBITDA*" means for the sum of (a) the net income (or net deficit) of the Company, *plus* (b) to the extent deducted from revenue in computing net income for such period, the sum of (i) interest expense, (ii) income tax expense, and (iii) depreciation and amortization. The Company's EBITDA shall be calculated by the Company's accountants using consistently applied accounting principles and in accordance with the historical practices of the Company.

"*Rules*": is defined in **Section 10.03**.

"*Sale Notice*": is defined in **Section 3.06(b)**.

"*Sale Transaction*": means the Transfer by the Class A Common Member, in one transaction or a series of transactions, of all Units of such Member to a Third Party or group of Third Parties and, as a result of which, such Third Party or group of Third Parties would own a majority of the outstanding Class A Common Units on a fully-diluted, as-converted basis.

"*SEC*": means the U.S. Securities and Exchange Commission.

"*Securities Act*": shall mean the Securities Act of 1933, as amended, together with the rules and regulations promulgated thereunder.

"*Selling Member(s)*": is defined in **Section 3.06(a)**.

"*Spouse*": means a spouse, a party to a civil union, a registered domestic partner, a same-sex spouse or partner, or any person in a Marital Relationship with a Member.

"*Spousal Consent*": is defined in **Section 10.15**.

"*Tag-Along Member*": is defined in **Section 3.06(a)**.

"*Tag-Along Notice*": is defined in **Section 3.06(c)**.

"*Tag-Along Period*": is defined in **Section 3.06(c)**.

"*Target Balances*": is defined in **Section 7.05(b)**.

"*Tax Distribution(s)*": is defined in **Section 7.04**.

"*Third Party*": means, with respect to any contemplated or purported Transfer, any Person other than the holder of record of the Units subject to such Transfer immediately prior thereto or any Affiliate thereof.

"*Transfer*": means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person. "*Transfer*" when used as a noun shall have a correlative meaning. "*Transferor*" and "*Transferee*" mean a Person who makes or receives a Transfer, respectively.

"*Treasury Regulations*": means the Income Tax and Administrative Procedure Regulations promulgated under the Code, as amended from time to time.

"*Unit*": means a unit representing a fractional part of the Membership Interests of the Members, and shall include all types and classes of Units, including the Class A Common Units; provided, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement, and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"*Unreturned Capital Contributions*": means, with respect to each Member, at any time of determination, an amount equal to (a) the aggregate amount of such Member's Capital Contributions made on or prior to such date of determination with respect to all Units then held by such Member, *minus* (b) the amount of distributions received by such Member (or its predecessors in interest) in return of such Capital Contributions under **Section 7.03(b)(i)** of this Agreement with respect to all Units then held by such Member.

"*Wholly-Owned Affiliate*": of any Person means (a) a Person which is one hundred percent (100%) owned, directly or indirectly, by such first Person, (b) a Person which owns one hundred percent (100%) of the first Person, directly or indirectly, or (c) a Person which is under one hundred percent (100%) common ownership, directly or indirectly, with such first Person through a common parent entity.

2. Certain Conventions. For all purposes of this Agreement, except as otherwise expressly provided for herein or unless the context of this Agreement otherwise requires: (a) whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation"; (b) the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references shall refer to this Agreement unless otherwise specified; (c) the meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms; (d) words of any gender are deemed to include each other gender; (e) a reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns; (f) a reference to any agreement shall be to such agreement (together with the schedules and exhibits attached hereto) as it may have been amended, modified, supplemented, waived or restated from time to time in accordance with its terms; (g) a reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and rules issued thereunder or pursuant thereto; and (h) all references to "$", "funds" and "dollars" refer to United States currency unless otherwise expressly provided.

**Schedule 1**

**MEMBERS SCHEDULE (AS OF JUNE 1, 2021)**

| NAME | NUMBER OF UNITS | PERCENTAGE INTEREST |
|---|---|---|
| Joseph & Alona Cohen Family Trust<br><br>Address: | 400 Class A | 40% |
| Isaac G. Cohen Living Trust<br><br>Address: | 400 Class A | 40% |
| Jonathan Knapp<br><br>Address: | 200 Class A | 20% |

**CONEY ISLAND PICNIC, LLC**

**OPERATING AGREEMENT**

**EXHIBIT A**

Form of Joinder Agreement

The undersigned is executing and delivering this Joinder Agreement pursuant to the OPERATING AGREEMENT of **CONEY ISLAND PICNIC, LLC**, a Nevada limited liability company, dated as of ________, 2021 (as the same may be amended or amended and restated from time to time, the "*Agreement*"). Capitalized terms used but not defined in this Joinder Agreement shall have the respective meanings ascribed to them in the Agreement.

By executing and delivering this Joinder Agreement to the Agreement, the undersigned hereby agrees to be admitted as a Member of the Company and to become a party to, to be bound by, and to comply with the provisions of the Agreement in the same manner as if the undersigned were an original signatory to such agreement as a Member. In connection therewith and without limiting the foregoing, effective as of the date hereof the undersigned hereby makes the representations and warranties contained in the Agreement.

Accordingly, the undersigned has executed and delivered this Joinder Agreement as of the __ day of _____________, 20___.

Name: ______________________

Address: ______________________

______________________

______________________

**For individual Member:**

________________________________
Signature

________________________________
Print or type name of Member

Acknowledged and accepted:

**Coney Island Picnic, LLC**

By:______________________________
Name: Joseph Cohen
Title: Manager

**For Members other than individuals:**

________________________________
Print or type name of Member

By:______________________________
Name:
Title:

**CONEY ISLAND PICNIC, LLC**

**OPERATING AGREEMENT**

**EXHIBIT B**

Form of Spousal Consent

I, the undersigned, spouse of _________________________, acknowledge that I have read and understand the terms of that certain Operating Agreement of Coney Island Picnic, LLC (the "**Company**"), a Nevada limited liability company, dated as of ______________, 2021 (as the same may be amended, restated, modified or otherwise supplemented from time-to-time, the "**LLC Agreement**").

I am aware that by its provisions, my spouse has agreed to certain restrictions on the transfer or sale of Membership Interests (as such term is defined in the LLC Agreement) owned by my spouse, and that upon the legal separation or dissolution of my marriage to my spouse, I must comply with certain provisions of the Agreement (including, without limitation, the provisions of Section 3.08 therein).

I am aware that the legal, financial and related matters contained in the LLC Agreement are complex and that I have had the opportunity to retain independent professional guidance and/or legal counsel with respect to this spousal consent. I have either sought such guidance or counsel or have made a conscious decision, after reviewing the LLC Agreement carefully, not to seek such guidance or counsel. I hereby represent and warrant that I fully understand (i) the terms of the LLC Agreement (including, without limitation, the provisions of Section 3.08 therein), (ii) the rights and obligations of the members of the Company under the LLC Agreement, and (iii) the significance of my execution of this spousal consent.

I hereby agree that my interest, if any, in any Membership Interests of my spouse are irrevocably bound by the LLC Agreement and further agree that any community property interest I may have in any such Membership Interests shall be similarly bound by the LLC Agreement. I further agree that if I predecease my spouse, any interest I may have in any Membership Interests that passes by will or as a result of intestacy, shall pass subject to the terms of the LLC Agreement.

Executed on ________________ ____, 20___.

Signature: __________________________________

Print Name:_________________________________

Address:____________________________________

___________________________________________

___________________________________________

Email:______________________________________